IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS E. PEREZ, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 12-6171 ) |
| AMERICAN FUTURE SYSTEMS, INC. d/b/a PROGRESSIVE BUSINESS PUBLICATIONS, a corporation; and EDWARD SATELL, individually and as President of the above referenced corporation, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
TO EXCLUDE THE EXPERT TESTIMONY OF DR. JONATHAN GURYAN**

M. Patricia Smith
Solicitor of Labor

Linda Thomasson
Acting Regional Solicitor

Adam F. Welsh
A. Scott Hecker
Attorneys
Office of the Solicitor
Suite 630E, The Curtis Center
170 S. Independence Mall West
Philadelphia, PA 19106-3306
(215) 861-5159
(215) 861-5162 (fax)
welsh.adam@dol.gov
hecker.scott@dol.gov

U.S. Department of Labor

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| I. | **Introduction** | 1 |
| II. | **Legal Argument** | 2 |
| | A. The Expert Must be Qualified | 3 |
| | B. The Expert Testimony Must be Reliable | 4 |
| | C. The Expert Testimony Must be Relevant | 6 |
| III. | **Dr. Guryan's Opinions do not Meet the Standard for Admissibility** | 6 |
| | A. The Opinions Dr. Guryan Based on Statistical Analyses Lack "Fit" | 7 |
| | B. Dr. Guryan Employed Flawed Methodologies in Conducting His Statistical Analyses | 8 |
| | C. Dr. Guryan's Discussions of the Theory of Equalizing Differences is Irrelevant and Incomplete | 9 |
| | D. Dr. Guryan Relied on Problematic Interviews | 10 |
| | E. Dr. Guryan Expresses Conclusory Opinions Unsupported by Facts | 13 |
| IV. | **Conclusion** | 15 |

# TABLE OF AUTHORITIES

**Regulations**

29 CFR § 785.18 .................................................................................................................. 1, 2, 6, 12

**Federal Rules of Evidence**

Fed. R. Evid. 702 ....................................................................................................................... passim
Fed. R. Evid. 703 ......................................................................................................................... 5, 12
Fed. R. Evid. 801 ............................................................................................................................. 12

**Cases**

Aeromotive Metal Products, Inc. v. Wirtz,
    312 F.2d 728 (9th Cir. 1963) ...................................................................................................... 7
Brooklyn Sav. Bank v. O'Neill,
    324 U.S. 697 (1945) ................................................................................................................... 9
Calhoun v. Yamaha Motor Corp., U.S.A.,
    350 F.3d 316 (3d Cir. 2003) .................................................................................................. 3, 4
Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993) ........................................................................................................... passim
Elcock v. Kmart Corp.,
    233 F.3d 734 (3d Cir. 2000) ...................................................................................................... 5
General Electric Co. v. Joiner,
    522 U.S. 136 (1997) ................................................................................................................... 6
In re Paoli Railroad Yard PCB Litigation,
    35 F.3d 717 (3d Cir. 1994) ............................................................................................... 4, 5, 13
Kumho Tire Co., Ltd. v. Carmichael,
    526 U.S. 137 (1999) .......................................................................................................... 3, 4, 5
Mitchell v. Greinetz,
    235 F.2d 621 (10th Cir. 1956) ................................................................................................ 1, 2
Pittsburgh Press Club v. U.S.,
    579 F.2d 751 (3d Cir. 1978) ............................................................................................... 10, 11
Salem v. U.S. Lines Co.,
    370 U.S. 31 (1962) .................................................................................................................... 14
Sterling v. Redevelopment Auth. of City of Philadelphia,
    836 F. Supp. 2d 251 (E.D. Pa. 2011) ................................................................................... 5, 14

Plaintiff Thomas E. Perez, Secretary of Labor, United States Department of Labor ("Plaintiff" or the "Secretary"), submits this Memorandum in Support of his Motion to Exclude the Expert Testimony of Dr. Jonathan Guryan.  Dr. Guryan's opinions, set forth in his expert report submitted on behalf of Defendants, fail to meet the admissibility standards for expert testimony prescribed by the Federal Rules of Evidence and relevant case law.

I.     **Introduction**

Plaintiff's contemporaneously filed Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Summary Judgment Memo") references the facts relevant to these proceedings, so counsel for the Secretary will not repeat them here.  The crux of the Secretary's case concerns Defendants' failure to pay Progressive Business Publication's ("Progressive") telemarketers the federal minimum wage, as established by the Fair Labor Standards Act ("FLSA"), due to Defendants' decision not to compensate their telemarketers for any breaks, including short breaks of twenty minutes or less in violation of 29 CFR § 785.18.[1]

Defendants retained Dr. Guryan "to opine on whether the sales representatives or [Progressive] benefit from the policy." JA0760.[2]  Accordingly, his expert report purports to analyze who benefits from Defendants' break policy: Defendants or Progressive's telemarketers. Setting up a false dichotomy, Dr. Guryan opined on whether Defendants' break policy benefits Progressive's telemarketers *or* Progressive itself, but he ignored the fact that a break benefits *both* the employees *and* the employer.  *See Mitchell v. Greinetz*, 235 F.2d 621, 625 (10th Cir.

---

[1] 29 C.F.R. § 785.18 ("Rest") provides as follows:

> Rest periods of short duration, running from 5 minutes to about 20 minutes, are common in industry.  They promote the efficiency of the employee and are customarily paid for as working time.  They must be counted as hours worked. Compensable time of rest periods may not be offset against other working time such as compensable waiting time or on-call time.

[2] All record citations are to the Joint Appendix. *See* March 13, 2014, Order (ECF No. 24).  Document titles are provided in the Joint Appendix Index.

1956) ("While no doubt [short rest periods] are beneficial to the employees, they are equally beneficial to the employer . . . .").

Counsel for the Secretary does not dispute the achievements and honors listed on Dr. Guryan's curriculum vitae. However, his credentials cannot overcome his opinions' inadmissibility. As a labor economist without specific knowledge of the literature addressing the benefits of workday breaks, *see* JA0262:4-0263:3, Dr. Guryan failed to comprehend the underpinnings of 29 C.F.R. § 785.18, a consistently-enforced, decades-old Department of Labor ("DOL") regulation. Rather, Dr. Guryan submitted statistical analyses too narrow to be meaningful to the Court's consideration of the Secretary's case against Defendants.

Accordingly, counsel for the Secretary submits that Dr. Guryan's opinions are inadmissible because the Court need not look beyond the relevant regulation, 29 C.F.R. § 785.18, to decide this case, because Dr. Guryan focused on only one, narrow, potential benefit, while ignoring numerous others, and because Dr. Guryan used flawed methodologies and expressed unsupported conclusions.

## II.     Legal Argument

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the principles established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 reads:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has interpreted Rule 702 to require that expert evidence be "not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) ("In *Daubert*, this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"). *Kumho* confirmed that the *Daubert* standard extends beyond traditional scientific testimony to all types of expert testimony, including testimony founded on engineering principles or other technical or specialized knowledge. 526 U.S. at 147.

  The Supreme Court further explained in *Daubert* that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science," and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." 509 U.S. at 590. *Daubert* mandates that the trial judge serve as a gatekeeper, who screens out "any and all scientific testimony or evidence" unless it is both "relevant" and "reliable." *Id*. at 589. The proponent of the evidence, in this case Defendants, bears the burden of proving the admissibility of the expert testimony "by a preponderance of proof." *Id.* at 592 n.10 (internal citation omitted). The Third Circuit Court of Appeals focuses on "the trilogy of restrictions" when considering the admissibility of "expert testimony: qualification, reliability, and fit." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (internal citation and quotation marks omitted).

    **A.** **The Expert Must be Qualified**

  The proposed expert must be qualified to testify by "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, and must "possess specialized expertise." *Calhoun*,

350 F.3d at 321 (internal citation and quotation marks omitted).  The Third Circuit has "interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert."  *Id.* (internal citation and quotation marks omitted).  However, the trier of fact must look beyond the general qualifications of the witness to determine if the proposed expert possesses the special knowledge or experience necessary to express a specific opinion on the facts of the particular case at hand.  *See Kumho Tire*, 526 U.S. at 153-58.

### B.     The Expert Testimony Must be Reliable

The proffered expert's testimony must be reliable, meaning it

> must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief . . . .  [A]n inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity.

*In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 590 & n.9).  When analyzing the reliability of a particular methodology, a district court should consider all relevant factors, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 742 n.8.

Reliable expert evidence must be based "in the knowledge and experience of the relevant discipline."  *Kumho*, 526 U.S. at 149 (internal citation, quotation marks, and alteration omitted).  Expert evidence cannot be reliable unless the expert uses and explains a sound process, such as

the scientific method, to reach his or her conclusions. *Daubert*, 509 U.S. at 590; *see also* Fed. R. Evid. 702(c) (To be admissible, expert testimony must be "the product of reliable principles and methods."). The reliability inquiry focuses on the validity of the expert's "principles and methodology," rather than on the correctness of the expert's conclusions. *Daubert*, 509 U.S. at 595. Beyond such principles and methodology, "an expert's testimony . . . must be accompanied by a sufficient factual foundation . . . ." *Elcock v. Kmart Corp.*, 233 F.3d 734, 754 (3d Cir. 2000) (internal citation and quotation marks omitted). "[W]here the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded." *Sterling v. Redevelopment Auth. of City of Philadelphia*, 836 F. Supp. 2d 251, 272 (E.D. Pa. 2011) (internal citation and quotation marks omitted), *aff'd*, 511 Fed. Appx. 225 (3d Cir. 2013).

Although the reliability inquiry allows a district court flexibility, an expert's opinion must employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Similarly, Federal Rule of Evidence 703 allows experts to base opinions on facts or data that "need not be admissible," but only where experts in the relevant field would reasonably rely upon such facts or data in forming opinions.[3] A court must determine through independent evaluation whether the expert's reliance is reasonable, and "the standard is equivalent to Rule 702's reliability requirement – there must be good grounds on which to find the data reliable." *Paoli*, 35 F.3d at 748.

---

[3] Federal Rule of Evidence 703 provides as follows:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

5

An expert may not simply self-validate the reliability of his or her testimony.  As the Supreme Court observed in *General Electric v. Joiner,* "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  522 U.S. 136, 146 (1997).  If Defendants fail to provide sufficient validation of the assumptions and facts underlying the opinions and reasoning of their expert, the Court cannot make the findings required by Rule 702 and must exclude the testimony.  *See Daubert*, 509 U.S. at 589-590.

        **C.**     **The Expert Testimony Must be Relevant**

Finally, Rule 702 requires that the expert's testimony be relevant to, or "fit," the issues in the case in order to "assist the trier of fact."  *Daubert*, 509 U.S. at 591.  To meet this admissibility standard necessitates that the expert's opinions address the relevant factual dispute.  *See id.* at 591-592.  To be helpful to the fact finder, the expert's testimony must have "a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Id.*  In other words, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Id.* at 591 (internal citations and quotation marks omitted).  Such irrelevant testimony does not "fit" the case, and a court should not admit it.  *See id.* at 591-592.

    **III.**     **Dr. Guryan's Opinions do not Meet the Standards for Admissibility**

As discussed in more detail in Plaintiff's Summary Judgment Memo, numerous courts have applied 29 C.F.R. § 785.18 to hold short breaks compensable solely based on their duration and without any further analysis of the benefits of those breaks.[4]  Though Dr. Guryan's credentials may pass muster, his opinions do not assist the Court in deciding this matter, as they

---

[4] Although the Secretary maintains that he does not need to prove that the subject breaks resulted in any measurable benefit to Progressive, he understands that Defendants will argue, through Dr. Guryan's statistical analyses and opinions, that Progressive does not benefit from breaks.  Accordingly, the Secretary will introduce his own expert evidence supporting the Department's long-standing regulation and rebutting the conclusions reached by Dr. Guryan.

are irrelevant to the subject of the case. Further, in reaching his conclusions, Dr. Guryan relies on erroneous methodologies and insufficient facts. Accordingly, Dr. Guryan's opinions suffer from numerous maladies and should be excluded even if the Court considers statistical expert testimony in deciding this case.

### A. The Opinions Dr. Guryan Based on Statistical Analyses Lack "Fit"

Using data compiled from Defendants' log-on/log-off and sales records, Dr. Guryan conducted fixed effects regression analyses concerning the relationship between an increased number of short breaks and an increased total duration of short breaks on a telemarketer's sales per paid hour. *See* JA0773-0775. The majority of Dr. Guryan's analyses returned statistically insignificant results leading him "to conclude that breaks – whether paid or unpaid – do not cause PBP's sales representatives to become more productive."[5] JA0760, JA0773-0777.

In order to prevail in this case, the Secretary need not demonstrate that breaks increase Progressive telemarketers' sales or that breaks provide statistically measurable benefits to Progressive. *See Aeromotive Metal Products, Inc. v. Wirtz*, 312 F.2d 728, 729 (9th Cir. 1963) (Decision that a 15-minute break period must be compensated was fully supported by the record, even though employer's production did not increase.). Rather, the Secretary must prove that Progressive's decision not to compensate its telemarketers for short breaks violates the minimum wage provisions of the FLSA. The relevant DOL regulation and interpretive case law inform covered entities that short breaks count as compensable time because these breaks provide benefits to both employees and employers.

---

[5] Dr. Guryan's lone statistically significant result, reported in his Table 7 at JA0776, is particularly irrelevant to the issues presented by this case because it addresses the relationship between an increased number of short breaks and an increased total duration of short breaks on a telemarketer's sales per total hour by including breaks of twenty minutes or less as compensable work time. *See* JA0775-0776. However, "Progressive was not paying for total hours – it was paying for paid hours," and Progressive focused "on the metric of sales per paid hour rather than sales per total hour." JA0799-800. Dr. Guryan's Table 8 suffers from the same infirmity. Opinions based on these tables lack "fit," and the Court should exclude them. *See Daubert*, 509 U.S. at 591-592.

7

Even assuming evidence of the benefits of employee breaks is relevant, Dr. Guryan's report is unhelpful because it addressed a single, narrow metric: sales per paid hour. In doing so, Dr. Guryan's report focused only on the daily effects of short breaks and did not consider longer term impacts that may benefit Defendants. *See* JA0286:11-0288:2, JA0301:18-0303:23. Dr. Guryan has only a passing familiarity with the relevant literature exploring the benefits to employers and employees of short, workday breaks. *See* JA0262:4-0263:3. Perhaps this is why he completely ignored relevant, potential benefits of such breaks to Progressive, including lower telemarketer turnover and absentee rates, and reduced costs associated with telemarketer recruiting, hiring, training, health care, and worker's compensation due to workplace injury. *See* JA0269:20-0272:17, JA0285:8-23, JA0666:16-0667:12, JA0676:7-0678:11, JA0683:22-0686:11, JA0688:3-16, JA0689:2-0690:5, JA0690:20-0691:19, JA0733-0735, JA0742-0743, JA0793, JA0806-0807.

With a regulation addressing the primary issue in dispute, Dr. Guryan's limited analyses are unnecessary to the Court's consideration of this case and in no way assist in answering the pertinent inquiries of the subject proceeding; therefore, Dr. Guryan's opinions should be excluded.

    **B.**   **Dr. Guryan Employed Flawed Methodologies in Conducting His Statistical Analyses**

Beyond Dr. Guryan's failure to apply his analyses to the relevant questions at issue in this proceeding and his testimony's inability to assist the Court in reaching its decision, Dr. Guryan also based his opinions on flawed methodologies. Dr. Guryan improperly included in his analyses a number of high-variance observations that skewed his results. The Secretary's rebuttal expert, Dr. David Crawford, illustrated the high sensitivity of Dr. Guryan's analyses to

these data points by taking into account their excessive variances and excluding or weighting them where appropriate.

Initially, Dr. Crawford attempted to recreate the dataset used by Dr. Guryan. Though Dr. Crawford was unable to do so, his efforts came close to reproducing Dr. Guryan's universe of observations. *See* JA0289:24-0290:12, JA0611:16-0613:15. By removing high-variance observations based on small numbers of hours worked, *see* JA0614:12-17, Dr. Crawford obtained statistically significant results in a majority of his analyses that demonstrated positive impacts of the number of short breaks or total duration of short breaks on sales per paid hour. *See* JA0801-0804. Subsequently, using the dataset constructed by Dr. Guryan, Dr. Crawford achieved similar results not only when re-running his initial models, but also when symmetrically eliminating outlier data and when weighting each data point. *See* JA0605:16-0613:15. In his report, Dr. Guryan failed to address outlier data in any systematic way, despite the fact that outlier data can significantly impact data analyses. *See* JA0291:14-0292:3, JA0798-0799.

Such a methodological flaw further demonstrates that this Court should exclude Dr. Guryan's analyses of breaks and sales.

### C. Dr. Guryan's Discussion of the Theory of Equalizing Differences is Irrelevant and Incomplete

Dr. Guryan's reliance on the theory of equalizing differences (or compensating wage differentials) failed to acknowledge that the FLSA provides a compensation floor under which Progressive's employees' wages may not fall. Employees cannot waive their statutory right to the minimum wage in exchange for other, non-monetary benefits. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706-708 (1945). Whether Progressive's telemarketers desired this

9

compensation structure or were willing to sacrifice pay for additional break flexibility is irrelevant.[6]

Dr. Guryan also failed to acknowledge a foundational assumption of economic theory that businesses operate to maximize profits. *See* JA0617:18-24, JA0791-0792. The fact that Progressive adopted a policy of not paying for breaks suggests that it benefitted from that decision. *See* JA0616:9-0620:7, JA0791-0792. Dr. Guryan applied the theory of equalizing differences to the facts of this proceeding without considering the benefits to Progressive suggested by the theory. *See* JA0616:9-0617:17, JA0791-0792.

Such an incomplete exploration of the theory of equalizing differences inherently results in unreliable opinions. The Court should disregard any conclusions Dr. Guryan reached based on this theory, since Dr. Guryan did not reliably apply his methods to the facts of this case. *See* Fed. R. Evid. 702(d).

### D.  Dr. Guryan Relied on Problematic Interviews

Unable to point to specific, pre-existing support for his opinions, Dr. Guryan turns to summarizing nine of thirteen employee interviews in which he participated to conclude that "at least some and possibly many of the [Progressive] sales representatives [would be] worse off" if Progressive paid for all breaks less than twenty minutes because, Dr. Guryan asserts without evidence, Defendants would be forced to restrict short breaks under a universal compensation policy. *See* JA0761. Dr. Guryan relies, at least in part, on anecdotal information from a small, non-random sample of Progressive telemarketers to support this opinion. *See* JA0266:8-0267:4, JA0277:17-0278:19, JA0762 n.4.

In *Pittsburgh Press Club v. U.S.*, the Third Circuit noted that

---

[6] The Secretary does not concede that Progressive's telemarketers desired this system. As discussed below, the employee interviews cited by Dr. Guryan are not representative and provide inadequate support for such an assertion.

> several factors . . . must be examined when determining whether a poll meets generally accepted survey principles. A proper universe must be examined and a Representative sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation. A fortiori, the Respondents should be similarly unaware.

579 F.2d 751, 758 (3d Cir. 1978). Dr. Guryan's discussions with Progressive telemarketers represent a different mechanism from the survey at issue in *Pittsburgh Press Club*; however, many of the same concerns apply and raise concerns about the reliability of conclusions based in any part on the employee interviews.

The interviewees were selected by Progressive and/or its counsel, who primarily conducted the interviews. *See* JA0274:23-0276:2. Dr. Guryan did not choose the employees to interview, nor did he serve as the primary interviewer. *See id.* The interviews were not "structured" in the traditional sense, as they were not conducted by qualitative researchers, who planned a set of questions ahead of time that they then asked in a systematic way. *See* JA0273:18-0274:10. The interviewees, who were most assuredly aware of the purpose of Dr. Guryan's interviews, in no way drafted, reviewed, or acknowledged the accuracy of his summaries of their interview responses. *See* JA0280:8-0281:19. Though Dr. Guryan alleges that his reliance on the interviews was limited, he spent a significant portion of his report recounting these employees' stories. *See* JA0274:2-17, JA0275:13-0279:5, JA0762-0769. Dr. Guryan's participation in the interviews appears minimal, and such an unscientific interview process should not be accepted by this Court. Pursuant to the requirements of Federal Rule of Evidence

703, Dr. Guryan unreasonably relied on these interviews, and any opinions he based on them should be excluded. *See* Fed. R. Evid. 703 and 801(c).[7]

Further, the interviews are of questionable relevance because many of the activities Progressive employees discussed with Dr. Guryan would take longer than twenty minutes to perform. *See* JA0282:11-19, JA0763-0769. The longer breaks described by Dr. Guryan's interview summaries relate to schedule flexibility and do not implicate the typical, short workday breaks deemed to be compensable under 29 C.F.R. § 785.18. The Secretary does not argue that Progressive should pay for these longer breaks, again demonstrating the irrelevance of Dr. Guryan's opinions.

In addition, some of the employee activities referenced in Dr. Guryan's report inarguably benefit Progressive and undercut Dr. Guryan's arguments. For example, Ms. Bonnie Peters, a diabetic, "stop[s] working to get something to eat to get her blood sugar levels up again . . . . [S]he needs to check her blood sugar levels regularly . . . . [T]his only takes a few minutes . . . ." JA0768-0769. Maintenance of employee health represents one of the many benefits Defendants derive from short breaks.

The Court should disregard all portions of Dr. Guryan's report relating to or based on his employee interviews and exclude any opinions that derive from them. Dr. Guryan based those opinions on improper methodologies and unreliable or irrelevant facts and data. Accordingly,

---

[7] The summaries of employee interviews included in Dr. Guryan's report arguably represent inadmissible hearsay. *See* Fed. R. Evid. 801(c). Federal Rule of Evidence 801(c) provides as follows:

> (c) Hearsay. "Hearsay" means a statement that:
>
>> (1) the declarant does not make while testifying at the current trial or hearing; and
>>
>> (2) a party offers in evidence to prove the truth of the matter asserted in the statement.

they cannot satisfy the reliability and fit prongs of *Daubert* and its Third Circuit progeny.  *See also* Fed. R. Evid. 702(b)-(c).

### E. Dr. Guryan Expresses Conclusory Opinions Unsupported by Facts

Dr. Guryan opined "that if PBP were forced to pay its sales representatives for all breaks 20 minutes or less, it would not be economically sustainable to allow workers to take breaks without restriction."  JA0761.  This opinion is neither reliable nor relevant to the questions at issue in this proceeding.

Dr. Guryan cites no specific theory or data supporting his opinion concerning the economic feasibility of universal compensation for breaks of twenty minutes or less.  He bases his conclusion that such a policy would not be economically sustainable on his "understanding of economics" and its "basic tenet . . . that people respond to incentives."  JA0264:15-0265:6, JA0308.  An allegedly expert opinion based on a general understanding of economics or the idea that people respond to incentives – an inherently self-evident statement, as inducing action is the very purpose of an incentive – cannot meet the requirements of admissibility because, without more, this Court cannot properly evaluate such an opinion under the *Daubert* framework.  *See Daubert* at 590; *Paoli*, 35 F.3d at 742 n.8.

This opinion also does not help the Court address the pertinent inquiries of the instant case.  As the Advisory Committee Notes to Federal Rule of Evidence 702 highlight:

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*Id.* (internal citation and quotation marks omitted).  Federal Rule of Evidence 702 requires that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue," something this opinion of Dr. Guryan's does not do. Fed. R. Evid. 702(a). It follows that expert testimony should be excluded where

> all the primary facts can be accurately and intelligibly described to the jury, and . . . they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.

*Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) (internal citation and quotation marks omitted); *see also Sterling*, 836 F. Supp. 2d at 272 (Expert report and testimony must be excluded when based on mere speculation without factual support.).

Further, Progressive can manage its workforce how it sees fit, so long as it complies with the law, and Defendants can implement any number of compliant, profitable break policy options. For example, Progressive could provide for unlimited but lengthier breaks, as neither side argues that such longer breaks in excess of twenty minutes are compensable. Progressive could also employ a system similar to its old policy, which provided for set breaks of fixed length. Progressive's old policy paid for thirty minutes' worth of breaks per day.[8] *See* JA0861. From August 10, 2009, through June 14, 2013, Progressive telemarketers' average, daily breaks of twenty minutes or less totaled approximately 32 minutes. *See* JA0298:19-0299:5, JA0825, JA0839-0840. That Progressive telemarketers take the same amount of short break time under the old and new policies calls into question Dr. Guryan's unsupported contention regarding the economic feasibility of paying for all breaks lasting twenty minutes or less.

Lacking foundation in a specific theory or reliable technique, Dr. Guryan's opinion regarding Progressive's economic sustainability does not meet the admissibility standards

---

[8] All but one of the locations listed in Dr. Guryan's original Table 2 report an average total break time per day of less than seventy-five minutes. *See* JA0772. Interestingly, adding the two, fifteen-minute, paid breaks telemarketers received under Progressive's previous policy to a forty-five-minute lunch break totals seventy-five minutes of break time per day.

14

prescribed by the Federal Rules of Evidence or *Daubert* and its progeny.  Since Defendants cannot establish its reliability or relevance by a preponderance of the evidence, the opinion should be excluded.  *See Daubert*, 509 U.S. at 589, 594-595.

### IV.     Conclusion

The opinions expressed in Dr. Guryan's report do not satisfy the criteria considered by courts in this Circuit or by the Supreme Court when determining the admissibility of expert testimony.  Dr. Guryan failed to address the pertinent inquiries of the case and performed narrow analyses that ignore the myriad benefits short, workday breaks provide to an employer like Progressive.  The DOL's relevant regulation and the applicable case law also render moot Dr. Guryan's testimony.  Absent the necessary fit and improperly founded on flawed methodologies, Dr. Guryan's opinions do not assist the trier of fact and should be excluded by this Court.

                                                               Respectfully submitted,

                                                               M. Patricia Smith
                                                               Solicitor of Labor

                                                               Linda Thomasson
                                                               Acting Regional Solicitor

                                                               s/ A. Scott Hecker
                                                               Adam F. Welsh
                                                               A. Scott Hecker
                                                               Attorneys

                                                               U.S. DEPARTMENT OF LABOR
                                                               Office of the Solicitor
                                                               Suite 630E, The Curtis Center
                                                               170 S. Independence Mall West
                                                               Philadelphia, PA 19106
                                                               (215) 861-5164
                                                               (215) 861-5162 (fax)
                                                               welsh.adam@dol.gov
                                                               hecker.scott@dol.gov

                                                               Attorneys for Plaintiff